2026 IL App (4th) 251048
NO. 4-25-1048

FILED
August 14, 2026
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| WENDY WAKENIGHT, | ) | Appeal from the |
|     Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Lee County |
| KATHERINE SHAW BETHEA HOSPITAL, | ) | No. 20L26 |
| a Not-for-Profit Corporation, d/b/a KSB Hospital; | ) | |
| and DR. BRANDON GUMBINER, D.P.M. | ) | Honorable |
|     Defendants-Appellees. | ) | Matthew T. Klahn, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Justices Doherty and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1 In December 2020, plaintiff, Wendy Wakenight, filed a complaint against defendants, Dr. Brandon Gumbiner, D.P.M. (Dr. Gumbiner), and Katherine Shaw Bethea Hospital, doing business as KSB Hospital (KSB), alleging negligence based upon Dr. Gumbiner's treatment of Wakenight's plantar fasciitis. The complaint alleged generally that Dr. Gumbiner's negligent treatment, which included two foot surgeries, caused nerve damage.

¶ 2 In June 2024, Wakenight filed a motion *in limine*, seeking to bar at trial any reference to informed consent or known risks or complications of the surgical procedures. In August 2024, the trial court granted the motion in part by barring defendants from introducing Wakenight's informed consent form or arguing that she waived any claim of negligence.

¶ 3 In September 2024, the trial court conducted a six-day jury trial. During the trial,

defendants elicited testimony from Dr. Gumbiner and Wakenight that Dr. Gumbiner had discussed the known risks and complications of the surgical procedures with Wakenight. The jury returned a general verdict in favor of defendants and answered special interrogatories finding no breach of the standard of care on any of the six theories Wakenight asserted.

¶ 4     In March 2025, Wakenight filed a motion for a new trial, asserting that the trial court erred by allowing defendants to introduce testimony regarding the known risks and complications of the surgical procedures. In September 2025, the court denied the motion.

¶ 5     Wakenight appeals, arguing that the trial court erred by denying her motion for a new trial because, despite the court's *in limine* ruling barring either evidence of informed consent or argument that Wakenight waived any claim of negligence, references at trial to discussions between Dr. Gumbiner and Wakenight about known risks and complications (1) confused the jury by conflating the issues in an informed consent case, which was not a theory of recovery in this case, with the issues in a medical negligence case and (2) allowed defendants to assert an unpled assumption of the risk defense. Wakenight asserts these errors substantially prejudiced her, warranting a new trial.

¶ 6     Because, under the particular circumstances of this case, we conclude that Wakenight has failed to meet her burden of showing that she was substantially prejudiced by the admission of the evidence in question, we affirm the judgment of the trial court.

¶ 7                    I. BACKGROUND

¶ 8                    A. The Complaint

¶ 9     In December 2020, Wakenight filed a complaint against defendants, asserting a medical negligence claim against Dr. Gumbiner individually and seeking to hold KSB vicariously liable as Dr. Gumbiner's employer. Specifically, the complaint alleged that Dr. Gumbiner

- 2 -

performed foot surgeries on Wakenight on December 6, 2018, and November 14, 2019, and during those procedures, Dr. Gumbiner failed to provide a reasonable standard of care by (1) tearing Wakenight's medial tendon and causing nerve damage and (2) failing to diagnose a superficial nerve entrapment and common fibular (peroneal) nerve entrapment. The complaint did not include a claim for lack of informed consent.

¶ 10 At trial, Wakenight ultimately asserted that Dr. Gumbiner breached the standard of care in the following six ways: (1) failure to "perform an x-ray, MRI, ultrasound, [electromyography/nerve conduction velocity test] or nerve block prior to the December 6, 2018 surgery," (2) failure to "provide adequate conservative care prior to the December 6, 2018, surgery," (3) failure to "perform surgery properly to protect the sural nerve during the December 6, 2018 surgery," (4) failure to "properly apply a cast on December 14, 2018," (5) failure to "properly examine for and diagnose tarsal tunnel nerve entrapment prior to [the first surgery]," and (6) failure to "properly examine for and diagnose peroneal nerve entrapment on or after January 27, 2020."

¶ 11 B. Wakenight's Motion *In Limine* No. 35

¶ 12 In June 2024, Wakenight filed her motion *in limine* No. 35, seeking "to bar reference to informed consent, known risk, or complication" at trial. She asserted that defendants intended to introduce "expert testimony that the procedure's risks were well-documented and commonly understood within the medical community." Wakenight contended that because she had not pleaded lack of informed consent, evidence of "informed consent, known risk, or complication" was irrelevant and would serve only to "confuse consent for medical treatment with a blanket waiver of liability, which would be a misapplication of the law."

¶ 13 Wakenight acknowledged that no Illinois authority supported her position, but she

relied on four out-of-state opinions: *Wilson v. Patel*, 517 S.W.3d 520 (Mo. 2017), *Brady v. Urbas*, 80 A.3d 480 (Pa. Super. Ct. 2013), *Wright v. Kaye*, 593 S.E.2d 307 (Va. 2004), and *Ehrlich v. Sorokin*, 165 A.3d 812 (N.J. Super. Ct. App. Div. 2017). Wakenight asserted that these cases generally held that evidence of informed consent in a medical malpractice case involving only negligence claims (and not a lack of informed consent claim) was irrelevant.

¶ 14    Defendants did not file a written response.

¶ 15    Later in June 2024, according to the docket sheet, the trial court conducted a hearing on all of the parties' motions *in limine*. We note that Wakenight did not include a transcript of this hearing as part of the record on appeal.

¶ 16    In August 2024, the trial court issued a comprehensive written order that ruled on each of the motions *in limine*, including Wakenight's motion *in limine* No. 35. The court granted Wakenight's motion in part and denied it in part, permitting evidence of known risks and complications as it related to Dr. Gumbiner's compliance with the standard of care and causation, but barring use of Wakenight's informed consent form and any argument that Wakenight had waived her negligence claim. Specifically, the court wrote as follows:

> "The defendants object to [Wakenight's] thirty-fifth motion *in limine*. The defendants conceded there is no lack of informed consent allegations [*sic*], but that does not eliminate the relevance of known complications resulting from properly performed surgical procedures among other grounds. [Wakenight] argues that defendants should be prohibited from making misleading arguments that [she] went into this surgery knowing this was the outcome. Defendants respond that known risks and complications are relevant in arguing that a patient may be appropriately treated and complications involving nerve injuries can still occur despite the

- 4 -

physician meeting the standard of care. Specifically, whether the forming of scar tissue caused her injury as opposed to defendants' not meeting the standard of care if the defendants have evidence to support that argument. The defendants should be barred from introducing [Wakenight's] informed consent form, and therefore, waived any claim of negligence, and the defendants conceded the same.

\* \* \*

\*\*\* [Wakenight's] thirty-fifth motion *in limine* is granted in part over the defendants' objection. Specifically, the defendants are barred from introducing [Wakenight's] informed consent form to argue that [she] waived any claim of negligence."

¶ 17 C. The Jury Trial

¶ 18 1. *Incomplete Record on Appeal*

¶ 19 In September 2024, over the course of six days, the trial court conducted a jury trial on Wakenight's claims. Wakenight, as appellant, has included in the record on appeal only selected excerpts of the testimony. From the court's docket sheet, we can determine that Wakenight has omitted (1) the pretrial hearing on the motions *in limine*, (2) Wakenight's opening statement, (3) Wakenight's direct examination, (4) the testimony of Wakenight's lay witnesses (her daughter and sister-in-law), (5) the testimony of treating physicians Dr. Paul Santangelo and Dr. Eric Meshulam, (6) the first day of Dr. Gumbiner's direct examination and the entirety of his cross-examination, (7) the jury instruction conference, (8) Wakenight's closing argument, and (9) the instructions to the jury, deliberations, and verdict. As a result, we cannot summarize the trial as a whole and can describe only the excerpts Wakenight chose to provide.

¶ 20 2. *Defendants' Opening Statement*

¶ 21    Defendants' opening statement provided a detailed chronology of Wakenight's treatment between August 2018, when she first saw Dr. Gumbiner seeking treatment for pain in both of her heels, and February 2020, when she last saw Dr. Gumbiner. Counsel told the jury that Wakenight had battled plantar fasciitis for several years and had found no relief. Dr. Gumbiner diagnosed her with plantar fasciitis and an "equinus contracture of the ankle," which is a condition caused by tightness of the calf muscle that limits ankle joint dorsiflexion. During subsequent visits, with Wakenight reporting no relief, Dr. Gumbiner also ordered continued conservative care, physical therapy, a second steroid injection, and prescription medication to reduce inflammation. By October 2018, Wakenight reported no improvement.

¶ 22    Relevant to this appeal, defense counsel told the jury the following occurred during the October 2018 office visit:

> "Dr. Gumbiner had a lengthy discussion with [Wakenight] at that visit regarding potential surgical options to address both the plantar fasciitis and the equinus contracture of the ankle.
>
> Dr. Gumbiner will testify that he fully explained the potential risks and benefits of the surgical procedures he was proposing, including a risk of damage to the nerves and that after this discussion [Wakenight] elected to proceed with surgery."

¶ 23    Counsel told the jury that Dr. Gumbiner performed the first surgery on Wakenight's right foot on December 6, 2018. After the surgery, Dr. Gumbiner applied a hard splint to her right lower leg. At a postoperative visit approximately eight days later, he applied a hard cast to immobilize her muscles and promote healing. Six days later, Wakenight returned for an unscheduled visit to KSB and was seen by Dr. Meshulam, complaining of tightness in her cast.

Dr. Meshulam cut the cast to release pressure. Regarding this visit, counsel asserted, "You will hear testimony that a recognized complication of the proper use of a cast is that it can become tight due to the tissue swelling and that can develop particularly if a patient is using their lower extremity."

¶ 24       Counsel also told the jury that Wakenight continued to follow up with Dr. Gumbiner and began reporting numbness on the top and outer side of her right foot after participating in physical therapy. As a result, Dr. Gumbiner ordered nerve conduction testing and continued conservative care, and he performed a steroid injection into Wakenight's sural nerve. She reported immediate relief, but that relief did not last. In April 2019, Dr. Gumbiner recommended a second surgery to "relieve any pressure on a nerve that might be causing Wakenight's symptoms," and counsel added that "[t]he evidence will show that Dr. Gumbiner fully explained [the procedures] and discussed the potential risks, benefits, and complications just like he had with the first surgery."

¶ 25       Defense counsel then stated that Wakenight instead sought treatment from Dr. Santangelo from May 2019 through August 2019. Counsel previewed Dr. Santangelo's testimony, stating that Dr. Santangelo "believe[d] [Wakenight's] symptoms were related to scar tissue or postoperative swelling that had occurred following Dr. Gumbiner's December 2018 surgery." Counsel also reiterated that scar tissue and swelling are recognized complications of a properly performed plantar-fasciitis surgery and that Wakenight's numbness was the result of her body's reaction to surgery, not improper technique.

¶ 26       Defense counsel also told the jury that Wakenight returned to Dr. Gumbiner, and in November 2019, he performed the second surgery that he had previously recommended. Counsel asserted, "The evidence will show that the scar formation that [Wakenight] experienced

and the fact that the sural nerve was entrapped was the result of [Wakenight's] own body['s] reactions to the initial surgery performed by Dr. Gumbiner and were not related to any improper surgical technique."

¶ 27        According to defense counsel, Wakenight began physical therapy in December 2019 and reported that (1) her heel pain had resolved but (2) she experienced increased numbness in her right foot and leg. As a result, Dr. Gumbiner ordered a second nerve conduction study, which was performed in February 2020. The results of the second study were essentially the same as the first and also detected reduced sural nerve response in the left foot, which had not been operated on.

¶ 28        Wakenight's last visit to Dr. Gumbiner occurred in February 2020. He recommended she seek a second opinion from another peripheral nerve specialist. Instead, she sought treatment from Dr. Michael Corcoran, a general podiatrist in Rockford, Illinois. According to counsel, Dr. Corcoran "believed that [the] numbness that [Wakenight] was complaining of was a known complication of the gastrocnemius recession either due to scar formation or postoperative swelling." Dr. Corcoran referred Wakenight back to Dr. Gumbiner, but she never returned to Dr. Gumbiner and received no further podiatric care on her right foot.

¶ 29        After concluding this detailed chronology of what defense counsel expected the evidence to show, counsel explained the standard of care and advised that expert witnesses would be testifying to aid the jury's determination of whether Dr. Gumbiner met that standard of care. Counsel explained how the evidence would show that he indeed met the standard of care at all times, emphasizing that the evidence would show Wakenight's numbness was the result simply of her own body's changes in anatomy following a properly conducted surgery by Dr. Gumbiner.

¶ 30                                3. *Wakenight's Evidence*

¶ 31        According to the trial court's docket sheet, Wakenight called four witnesses—namely, (1) Dr. Richard Braver (Wakenight's medical expert), (2) Chasity Irgin (Wakenight's daughter), (3) Tonya Braley (Wakenight's sister-in-law), and (4) Wakenight. Only Dr. Braver's testimony and a portion of Wakenight's testimony appear in the record.

¶ 32                                    a. Dr. Braver

¶ 33        Dr. Braver, a podiatrist and surgeon from New Jersey, testified as Wakenight's medical expert. Dr. Braver testified that, in his opinion, Dr. Gumbiner breached the standard of care in all six ways Wakenight claimed. Regarding known risks and complications of the surgical procedures Dr. Gumbiner performed, Dr. Braver testified as follows on direct examination:

> "Q. Can scar tissue develop after surgery and entrap a nerve without the podiatrist violating the standard of care?
>
> A. Scar tissue develops as a result of the surgery. It's not developing without the surgery. So, you get too close to the nerve, it can violate the standard of care, yes. It would violate the standard of care.
>
> Q. I'm trying to say, there could be a series of bad outcomes that don't violate the standard of care?
>
> A. That's right."

¶ 34        On cross-examination, Dr. Braver testified as follows when questioned by defense counsel:

> "Q. Now, you would agree, Dr. Braver, that a surgeon can perform a surgery; and even if it's done with the correct technique, there can still be a failure, true?
>
> A. Only if you protect the areas that are supposed to be protected and there's

a failure, then that's a problem. But again, if it's preventable, then there can be—there should not be a problem.

Q. And even with correct technique, there could be failures and there could be injuries to nerves, true?

A. If there's correct technique, there shouldn't be failures.

Q. And you would agree that injury to a nerve is a recognized risk and complication of a gastrocnemius recession surgery, true?

\* \* \*

A. If it's done properly and preventable, it should not happen. I would not agree with your statement."

¶ 35    Defense counsel also asked Dr. Braver about his opinion that Dr. Gumbiner applied the cast too tightly, causing permanent damage to Wakenight's peroneal nerve. Braver agreed that postsurgical swelling can occur if the patient fails to elevate the leg sufficiently or increases his or her activity. He also agreed that he was unaware of Wakenight's activities between the time Dr. Gumbiner applied the cast and the time Dr. Meshulam bivalved the cast. Although he insisted that Dr. Gumbiner applied the cast too tightly, he agreed with the general assertion that a cast can be applied within the standard of care and subsequent swelling may occur that requires the cast to be removed or bivalved.

¶ 36    Defense counsel also asked Dr. Braver about Dr. Corcoran's deposition testimony, which Dr. Braver stated he had reviewed. Counsel asked, "You would agree that Dr. Corcoran testified that postoperative swelling or postoperative scar formation are recognized complications that can occur with the type of surgery [Wakenight] had on December 6th of 2018, true?" Dr. Braver answered, "Swelling and scar tissue can happen. They always happen with any surgery you

do. It's just a question of how you protect the nerves."

¶ 37                                      b. Wakenight

¶ 38        Wakenight testified on her own behalf. We note that she did not include her direct examination as part of the record on appeal.

¶ 39        On cross-examination, Wakenight first testified about her visit with Dr. Corcoran, as well as the treatment she received from Dr. Santangelo. Thereafter, and throughout the majority of Wakenight's cross-examination, defense counsel asked Wakenight about her visits with Dr. Gumbiner, including what he told her about her condition, what was causing it, and what treatment he recommended.

¶ 40        In her brief to this court, Wakenight points to the following exchange that occurred during cross-examination, to which she objected, and which she asserts was irrelevant and prejudicial:

"Q. And when Dr. Gumbiner had a conversation with you about—specifically, about surgery in October 2019, he told you that in performing surgery there were potential risks, things like: Infection and bleeding; you could get painful scar formation; you could have stiffness or limitation of motion; you could get swelling or you could get damage to your nerves; all of those were things he talked with you about at that visit?

[WAKENIGHT'S COUNSEL]: Judge, just for the record, I'll renew the issue we talked about (inaudible) your ruling.

THE COURT: Okay. So the record will reflect the ongoing objection by [Wakenight]. Thank you.

Q. *** Those were part of the discussions, true?

A. I don't remember exactly all the things he told me but—

Q. You do remember that he told you there were certain risks?

A. Yes."

¶ 41     Relatedly, on redirect examination, Wakenight's counsel asked her the following:

"Q. Now, just one other topic, okay. And there was some discussion of before the first surgery your initial appointments with Dr. Gumbiner and him talking to you about the risks involved with surgery; do you remember that?

A. Yes.

Q. Okay. Did he ever tell you that he would deviate from the standard of care?

A. No.

Q. Did he ever tell you why he wasn't ordering an X-ray, MRI, or ultrasound?

A. No.

Q. Did he ever tell you that he had missed the tarsal tunnel diagnosis?

A. No.

Q. Did he ever tell you that he was not going to protect the sural nerve during your surgery?

A. No.

Q. Did he ever tell you that he was going to apply the cast too tightly and damage the common peroneal nerve?

A. No."

We note that the record does not include a transcript of what the parties had previously discussed

regarding Wakenight's earlier objection and the trial court's ruling.

¶ 42        Immediately thereafter, on re-cross-examination, the following exchange occurred:

"Q. And Dr. Gumbiner, in explaining the risks, told you that the surgery could be done appropriately and properly, and you could still experience complications such as bleeding or such as infections or things like even as—death associated with anesthesia care in addition to other things, true?

[WAKENIGHT'S COUNSEL]: Objection. Asked and answered and cumulative. [Defense counsel] covered this his first time with [Wakenight].

THE COURT: Overruled in regards to the asked and answered and the cumulative, and I'll note that your previous objection of pretrial motions remains.

Okay. Go ahead.

Q. (By [defense counsel]:) Do you remember the question?

A. Yes.

Q. He told you that, true?

A. Yes.

[DEFENSE COUNSEL]: That's all I have."

¶ 43        4. *Defendants' Evidence*

¶ 44        According to the trial court's docket sheet, defendants called four witnesses: (1) Dr. Santangelo (via video deposition), (2) Dr. Meshulam, (3) Dr. Stephen Barrett, and (4) Dr. Gumbiner. Wakenight has included in the record on appeal only the testimony of Dr. Barrett and a portion of the testimony of Dr. Gumbiner.

¶ 45        a. Dr. Barrett

¶ 46        Just prior to Dr. Barrett taking the stand, outside of the presence of the jury while

discussing a ruling on a motion *in limine* not pertinent to this appeal, the trial court asked both counsel whether they had anything further to add. The following exchange occurred:

"[WAKENIGHT'S COUNSEL]: Just as—for the objections, I'm assuming they are going to ask about risks. Same—can we have the same agreement; don't need to object, it's preserved?

THE COURT: Yes.

[DEFENSE COUNSEL]: I'm fine with having a standing objection to the questioning about—with respect to risk.

THE COURT: Okay. All right. That will be noted for the record too. That has been discussed both in the motions *in limine* as well as previous objections made during the trial. So those should be recognized as preserved for [Wakenight] as well."

We note that the record does not include a transcript of the earlier "agreement" the parties had previously reached regarding risk evidence.

¶ 47        Dr. Barrett then took the stand. Dr. Barrett, a podiatrist specializing in lower extremity peripheral nerve surgery, testified as an expert for the defense. He testified that, in his opinion, Dr. Gumbiner met the standard of care in all respects and that Wakenight's injuries were caused by "robust exuberant scar tissue formation" around the sural nerve following the first surgery—a recognized consequence of surgery performed within the standard of care—and not by any failure to protect the nerve. He also opined that Dr. Gumbiner properly applied the cast and that subsequent swelling—and not improper placement—caused temporary tightness, which Dr. Meshulam resolved by cutting the cast within a time frame that would not cause permanent damage to the nerve.

¶ 48                                    b. Dr. Gumbiner

¶ 49        As an initial matter, we note that, according to the trial court's docket sheet, Dr. Gumbiner testified for approximately 1 hour and 15 minutes the day before Dr. Barrett's testimony. The transcript of Dr. Barrett's testimony shows that the parties agreed to pause Dr. Gumbiner's testimony so Dr. Barrett could testify. Dr. Gumbiner's direct examination resumed after Dr. Barrett's testimony. However, Wakenight has included as part of the record on appeal only Dr. Gumbiner's testimony taken *after* Dr. Barrett's testimony, which we now summarize.

¶ 50        During direct examination, defense counsel reviewed with Dr. Gumbiner in chronological order his medical notes pertaining to Wakenight's treatment. Dr. Gumbiner explained each note in detail, including what Wakenight told him about her symptoms, his clinical examination of Wakenight, his findings and diagnoses, what he told Wakenight about his impressions and recommendations, and what treatment he prescribed or procedure he performed.

¶ 51        Regarding Dr. Gumbiner's October 2018 note, defense counsel pointed out that Dr. Gumbiner noted that Wakenight had failed all conservative care, and he therefore explained to her that "the last two options are custom orthotics or surgery." Counsel asked him to elaborate on those two options. When doing so, after explaining the orthotic option, the following exchange occurred regarding the surgical option:

> "A. *** [I]t's affecting her ability to work, and as far as I'm concerned then, you know, it's a discussion with the patient, but surgery would for her consist of the gastroc recession to lengthen that posterior muscle group and the plantar fasciotomy.
>
> Q. And did you discuss with her issues in terms of potential risks or complications?

A. I did.

Q. And what would the risks or complications be involving this potential surgery?

A. Yeah. So we discussed—you know, anytime there's surgery there's a risk of infection; risk of scar tissue; risk of nerve damage; risk of blood clots; risk that it will change the biomechanics of the foot, how the foot's going to function; discussing with that that she would need orthotics after the surgery to help support the foot; discuss the potential for hematoma formation; delayed healing of the skin and then, you know, with anesthesia the risk of loss of life as well.

Q. So with respect to the potential damage to the nerves or nervous system, what would that include?

A. So with these procedures in particular, would include the sural nerve because the sural nerve runs in the area of the gastrocnemius, and it includes the tibial nerve or the tarsal tunnel because that's in the area of the plantar fasciotomy.

Q. So what was the course of action at that point?

A. *** I told her to go home, think about it; think about her options; call back and let us know how she wanted to proceed.

* * *

Q. So what happens next?

A. We got a call, I think the next day, that she wanted to schedule surgery and surgery was scheduled for December 6[, 2018.]"

¶ 52    Later, during his direct examination, Dr. Gumbiner described an April 26, 2019, office visit, at which he discussed with Wakenight ongoing numbness she had developed in the

- 16 -

outside and top of her right foot, which had not responded to conservative care. As a result, Dr. Gumbiner discussed with her a second surgical procedure. On that topic, Dr. Gumbiner testified as follows:

"A. The surgery that was discussed was the exploration of the sural nerve with decompression as well as [a] tarsal tunnel release.

* * *

Q. Did you discuss with her certain risks *** and complications associated with the—this second surgery you were planning to do?

A. I did.

Q. And were those the same or similar to what *** [you] earlier described for the first surgery?

A. They would be similar. In regards to the nerve, sometimes with entrapment or scarring it is difficult to say how that's going to respond, and so I would have told Ms. Wakenight we will do everything we can to *** relieve your pain, but typically we can't give any guarantees in regards to the numbness."

¶ 53    As we have noted, Wakenight did not include her cross-examination of Dr. Gumbiner as part of the record on appeal.

¶ 54    Dr. Gumbiner's redirect examination pertained primarily to his treatment of Wakenight and his explanations for why he did not believe he breached the standard of care.

¶ 55    After Dr. Gumbiner testified, according to the docket sheet, the trial court addressed with the parties (1) defendants' motion for a partial directed verdict, (2) jury instructions, and (3) defendants' motion for special interrogatories. The transcript of these discussions is not included as part of the record on appeal. Accordingly, our review and summary of the trial resumes

with closing arguments.

¶ 56                             5. *Defendant's Closing Argument*

¶ 57        As we have noted, Wakenight did not include a transcript of her closing argument as part of the record on appeal. However, the record does contain a transcript of defense counsel's closing argument.

¶ 58        Defense counsel argued that Wakenight failed to prove that he breached the standard of care in any of the six ways she claimed. He argued instead that her injuries resulted from swelling and scar formation that were recognized complications following a properly performed surgery. Defense counsel did not argue that Wakenight assumed the risk or waived her right to sue by consenting to the procedures after being informed of the risks.

¶ 59                   6. *The Jury's Verdict and Special Interrogatories*

¶ 60        The jury returned a verdict in favor of defendants and also answered special interrogatories finding that Dr. Gumbiner did not breach the standard of care by failing to (1) perform an X-ray, MRI, ultrasound, nerve conduction study, or nerve block prior to the first surgery, (2) provide adequate conservative care prior to the first surgery, (3) perform surgery properly to protect the sural nerve during the first surgery, (4) properly apply the cast, (5) properly examine for and diagnose tarsal tunnel nerve entrapment prior to the first surgery, and (6) properly examine for and diagnose peroneal nerve entrapment on or after January 27, 2020.

¶ 61                  D. Wakenight's Motion for a New Trial

¶ 62        In March 2025, Wakenight filed a motion for a new trial.

¶ 63                        1. *The Motion*

¶ 64        Wakenight argued in her motion for a new trial that "repeated testimony regarding the known risks of [Wakenight's] surgery [created] undue prejudice against [Wakenight],

confus[ed] the issues and jury *** that she assumed risks of surgery, which was not her burden to disprove, warranting a new trial." Wakenight identified the following instances occurring during the trial during which defendants referenced discussions between Dr. Gumbiner and Wakenight of known risks or complications of surgery: (1) defendant's opening statement (*supra* ¶ 22), (2) defendants' cross-examination of Wakenight (*supra* ¶ 40), and (3) two instances during defense counsel's direct examination of Dr. Gumbiner (*supra* ¶¶ 51-52). In support of her argument, Wakenight cited three of the same out-of-state authorities she relied upon in support of her motion *in limine*—namely, *Brady*, *Wilson*, and *Wright*.

¶ 65            Regarding the incompleteness of the record on appeal, we note that, in her written motion, Wakenight alleged that "[a]fter opening statement and objections were raised to statements made, the trial court articulated its view that informed consent and risks [were] different after hearing argument," followed by the citation, "See Court correspondence, attached hereto as Exhibit A." However, Wakenight did not include in the record on appeal a transcript of the objections made after defendants' opening statement, nor is a copy of the court's correspondence refining or explaining its *in limine* ruling in response to those objections attached to Wakenight's motion in the record.

¶ 66                              2. *Defendants' Response*

¶ 67            In May 2025, defendants filed a written response to Wakenight's motion for a new trial. Defendants asserted the following: (1) the trial court appropriately ruled on motion *in limine* No. 35, allowing defendants to present evidence of recognized risks and complications because such evidence was relevant to defendants' compliance with the standard of care; (2) defendants complied with the court's ruling by never presenting any evidence or argument that Wakenight assumed the risk of her surgery; (3) Wakenight failed to demonstrate that she suffered any

prejudice resulting from the trial court's allowing evidence of known risks and complications; and (4) given the jury's verdict finding no breach of the standard of care, Wakenight has "failed to satisfy the two-issue rule."

¶ 68                                    3. *The Hearing*

¶ 69        In June 2025, the trial court conducted a hearing on Wakenight's motion for a new trial.

¶ 70        Wakenight argued consistent with her written motion that defendants had violated the trial court's *in limine* ruling by improperly raising the issue of informed consent during (1) defendants' opening statement, (2) Wakenight's cross-examination, and (3) Dr. Gumbiner's direct examination. Wakenight reiterated that "talking about informed consent, talking about these risks can confuse a jury who basically believes a plaintiff is at fault for going through the procedure."

¶ 71        Defendants responded that (1) the known risks of properly performed surgery were relevant to the standard of care and causation, (2) the out-of-state cases themselves permit such evidence when offered through experts, (3) defendants never argued assumption of the risk or waiver, and (4) the special interrogatories finding no breach on any theory defeated any claim of prejudice.

¶ 72        In reply, Wakenight asserted as follows:

> "I think we both agree that this testimony can come in if it comes in properly. It came in improperly. Their expert should have been the one talking about this. You know, he's a surgeon. These things can happen despite due care, despite this, despite that. That's not how it came in. It came in through opening that there is a lengthy discussion with [Wakenight].

What does that have to do with the standard of care? [Wakenight] can't establish standard of care. [Wakenight] has no bearing—has no foundation to say the standard of care was met or not met. Then it comes in through cross-examination with [Wakenight] again ***. It has nothing to do with standard of care. Their expert should have been the one to talk about it—talk about it properly."

¶ 73　　The trial court took the matter under advisement.

¶ 74　　　　　　　　　4. *The Trial Court's Ruling*

¶ 75　　In September 2025, the trial court issued a written ruling denying Wakenight's motion for a new trial.

¶ 76　　Relevant to this appeal, the trial court pointed out that, although Wakenight had not filed an informed consent claim in this case, "it was undisputed by the experts that [Wakenight's] outcome could have occurred if the standard of care was adhered to because it was a known potential complication of the surgery." As a result, the court found that "[t]he admission of the disclosure of known complications from the defendant, Dr. Gumbiner, to [Wakenight] was relevant in informing the jury that even if the standard of care was met, this was a possible outcome for [Wakenight]." The court further found that "the evidence was reliable because all physicians that testified confirmed the same."

¶ 77　　The trial court then found that "[e]ven if it was error to allow [the] disputed testimony," Wakenight was not prejudiced. The court pointed to the jury's answers to the special interrogatories finding no breach of the standard of care, as well as the court's "own experience and common sense" understanding that "people are well versed in the disclosure to patients of the possible complications that may occur with any surgery." The court concluded that the probative value of the evidence outweighed any prejudicial effect.

¶ 78    This appeal followed.

¶ 79                    II. ANALYSIS

¶ 80    Wakenight appeals, arguing that the trial court erred by denying her motion for a new trial because, despite the court's *in limine* ruling barring either evidence of informed consent or argument that Wakenight waived any claim of negligence, references at trial to discussions between Dr. Gumbiner and Wakenight about known risks and complications (1) confused the jury by conflating the issues in an informed consent case, which was unpled in this case, with the issues in a medical negligence case and (2) allowed defendants to assert an unpled assumption of the risk defense. Wakenight asserts these errors substantially prejudiced her, warranting a new trial.

¶ 81    Because, under the particular circumstances of this case, we conclude that Wakenight has failed to meet her burden of showing that she was substantially prejudiced by the admission of the evidence in question, we affirm the judgment of the trial court.

¶ 82            A. The Applicable Law and Standard of Review

¶ 83    "Generally, evidentiary rulings are within the sound discretion of the trial court and will not be reversed on review absent an abuse of discretion." *Lovell v. Sarah Bush Lincoln Health Center*, 397 Ill. App. 3d 890, 900 (2010). A trial court's decision to grant or deny a motion for a new trial is also reviewed for an abuse of discretion. *First Midwest Bank v. Rossi*, 2023 IL App (4th) 220643, ¶ 129. A trial court abuses its discretion only when the ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 84    "Erroneous evidentiary rulings are only a basis for reversal if the error was substantially prejudicial and affected the outcome of trial." (Internal quotation marks omitted.) *Id.* ¶ 160; see *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 32 ("[A] party is not entitled to reversal based on an erroneous evidentiary ruling unless the error

substantially prejudiced the aggrieved party and affected the outcome of the case."). "Conversely, where it appears that an error did not affect the outcome of the trial, or where the reviewing court can see from the entire record that the error did not result in substantial prejudice, the judgment will not be disturbed." *Bachman v. General Motors Corp.*, 332 Ill. App. 3d 760, 785 (2002).

¶ 85        The party seeking reversal bears the burden of showing prejudice. *Rossi*, 2023 IL App (4th) 220643, ¶ 160.

¶ 86                                B. This Case

¶ 87        Despite the complicated nature of the evidence and briefing in this case, Wakenight's argument on appeal essentially boils down to two simple assertions: (1) the trial court admitted irrelevant evidence and (2) the admission of irrelevant evidence substantially prejudiced Wakenight's right to a fair trial by (a) confusing the jury and (b) allowing defendants to assert an unpled assumption of the risk affirmative defense. We address each contention in turn.

¶ 88                        1. *Whether the Trial Court Erred*

¶ 89        Wakenight asserts that the trial court erred by allowing defendants to elicit testimony from Wakenight and Dr. Gumbiner that Dr. Gumbiner advised Wakenight of the known risks and complications of surgery prior to each surgery. She contends that such testimony amounted to evidence of informed consent, which was not relevant at her trial because she alleged only that Dr. Gumbiner breached the standard of care in his treatment of her, not that Dr. Gumbiner acted without her informed consent.

¶ 90        Wakenight correctly notes that medical negligence and lack of informed consent are different types of medical malpractice claims with different elements. Namely, a plaintiff alleging medical negligence must prove the following three elements: "[(1) T]he proper standard of care against which the defendant physician's conduct is measured; [(2)] an unskilled or

- 23 -

negligent failure to comply with the applicable standard; and [(3)] a resulting injury proximately caused by the physician's want of skill or care." *Purtill v. Hess*, 111 Ill. 2d 229, 241-42 (1986). A plaintiff alleging a lack of informed consent claim, on the other hand, must prove

> "(1) the physician had a duty to disclose material risks; (2) he failed to disclose or inadequately disclosed those risks; (3) as a direct and proximate result of the failure to disclose, the patient consented to treatment she otherwise would not have consented to; and (4) plaintiff was injured by the proposed treatment." *Coryell v. Smith*, 274 Ill. App. 3d 543, 546 (1995).

¶ 91 Wakenight's appeal centers on the difference in these two types of claims; her foundational argument is that evidence of informed consent is irrelevant and inadmissible in a case in which informed consent is not at issue. Wakenight concedes that no Illinois authority exists for this proposition, but she points to several out-of-state decisions that she contends "have persuasively provided a framework for arguing against the admission of informed consent evidence in cases where informed consent is not at issue."

¶ 92                 a. Wakenight's Out-Of-State Authority

¶ 93                    i. Waller v. Aggarwal

¶ 94 The earliest of the cases Wakenight cites is *Waller v. Aggarwal*, 688 N.E.2d 274 (Ohio Ct. App. 1996). In that case, the plaintiff filed a complaint alleging negligent performance of laparoscopic surgery, and the defendant asserted as a defense that the plaintiff "was fully apprised of the risks *** with the surgery in question, and knowingly and voluntarily gave her informed consent thereto." (Internal quotation marks omitted.) *Id.* The plaintiff specifically complained that the trial court (1) mentioned informed consent to the venire prior to jury selection and (2) allowed the defendant to (a) question the plaintiff about informed consent on cross-

examination, (b) elicit information about informed consent from the defendant on direct examination, and (c) discuss informed consent during closing arguments. *Id.* at 275. Additionally, the court admitted the plaintiff's informed consent form into evidence and submitted an interrogatory to the jury asking "whether the consent form 'was a valid waiver of the rights of [the plaintiff.]' " *Id.*

¶ 95 The jury returned a verdict in favor of the defendant, and the plaintiff appealed, arguing that the trial court improperly permitted the defendant to employ an affirmative defense of informed consent against the plaintiff's negligence claim. *Id.* at 274-75. The Ohio appellate court concluded that (1) the trial court erred because the appellate court could "find no law which states that informed consent constitutes an affirmative defense" and (2) the plaintiff was substantially prejudiced. *Id.* at 275. Regarding substantial prejudice, the Ohio appellate court explained as follows:

> "[T]he action brought against [the defendant] sounded in negligence. It did not sound in battery for a nonconsensual procedure. Nor did [the plaintiff] allege that she was not fully apprised of the risks of the procedure. Instead, [the plaintiff] alleged that [the defendant] negligently performed the procedure. The fact that [the defendant] informed [the plaintiff] that injury to the bladder was a possible risk of the procedure could not be a defense to the claim of negligence brought by [the plaintiff]. Thus, the admission of evidence pertaining to that issue and references to that issue carried great potential for the confusion of the jury." *Id*.

¶ 96 The appellate court rejected the defendant's argument that "such evidence was relevant to demonstrate that bladder injuries may occur during laparoscopic procedures in the absence of negligence," explaining, "[T]his theory could easily be demonstrated without confusion

through the testimony of an expert, rather than through the introduction of the consent form." *Id.* at 275-76.

¶ 97                                    ii. Wright

¶ 98        Eight years later, in *Wright*, 593 S.E.2d at 318-19, the Virginia Supreme Court, citing *Waller*, reversed in part the trial court's order granting summary judgment to the defendant in a medical malpractice claim. In *Wright*, relevant to this appeal, the plaintiff argued that the trial court had erred by denying her motion *in limine* "to exclude evidence of discussions between herself and [the defendant physician] as to the risk of injury to the bladder during an urachal cystoscopy." *Id.* at 317. The trial court, when it declined to exclude the evidence, reasoned that jurors "know[ ] that a prudent doctor must advise patients concerning any risk prior to surgery," and therefore, to avoid the implication that "maybe this doctor is negligent to begin with," it would be "fair to show that he did what a prudent doctor would do and advise of that particular risk." (Internal quotation marks omitted.) *Id.*

¶ 99        The Virginia Supreme Court rejected the trial court's reasoning, concluding instead that the trial court erred by denying the plaintiff's motion *in limine*. *Id.* The supreme court noted that the plaintiff had not pleaded or placed at issue the defendant's failure to obtain her informed consent; instead, she alleged only that he deviated from the standard of care when performing the medical procedure. *Id.* The court reasoned as follows:

> "Seen in that context, evidence of information conveyed to [the plaintiff] concerning the risks of surgery in obtaining her consent is neither relevant nor material to the issue of the standard of care. Further, the pre-operative discussion of risk is not probative upon the issue of causation: whether [the defendant] negligently performed the procedure.

[The plaintiff's] awareness of the general risks of surgery is not a defense available to [the defendant] against the claim of a deviation from the standard of care. While [the plaintiff] or any other patient may consent to risks, she does not consent to negligence. Knowledge by the trier of fact of informed consent to risk, where lack of conformed [*sic*] consent is not an issue, does not help the plaintiff prove negligence. Nor does it help the defendant show he was not negligent. In such a case, the admission of evidence concerning a plaintiff's consent could only serve to confuse the jury because the jury could conclude, contrary to the law and the evidence, that consent to the surgery was tantamount to consent to the injury which resulted from that surgery. In effect, the jury could conclude that consent amounted to a waiver, which is plainly wrong. See *Waller v. Aggarwal*, 116 Ohio App.3d 355, 688 N.E.2d 274, 275-76 (1996)." *Id.*

¶ 100                 iii. Hayes v. Camel

¶ 101        Wakenight also cites *Hayes v. Camel*, 927 A.2d 880, 883 (Conn. 2007), in which the sole issue on appeal was "whether, in a medical malpractice action without a claim of lack of informed consent, the trial court properly admitted testimonial and documentary evidence that the defendant surgeon had informed his patient of the risks of the medical procedure in question."

¶ 102        In *Hayes*, the plaintiff alleged that the defendant negligently performed spinal surgery, causing damage to his sacral nerves. *Id.* at 884. On appeal from a jury verdict in favor of the defendant, the plaintiff claimed that that trial court erred by denying his motions *in limine* to exclude (1) testimony by the defendant that he had informed the plaintiff that nerve damage was a risk of the procedure and (2) notes to that effect from the preoperative consultation. *Id.* at 885.

¶ 103        The trial court had determined that the evidence was relevant to "whether the

plaintiff had proven that his injuries were the result of a breach of the standard of care." *Id.* at 886. The trial court also concluded that (1) the defendant himself could testify about the risks of the procedure but (2) because there was no claim of lack of informed consent, evidence about whether the plaintiff understood the risks "could cause confusion and could lead a jury to think that [because the plaintiff] had signed [an informed consent form,] he had somehow consented to [his injury] or assumed the risks." (Internal quotation marks omitted.) *Id.* On the latter basis, the trial court barred the use of the words "informed consent" at trial and excluded the informed consent form from evidence. *Id.* The trial court also allowed the defendant's office consultation notes, "but only after ordering redacted portions of those notes indicating that the plaintiff understood the risks of the procedure as explained to him." *Id.* Additionally, the trial court advised the jury that "simply because something is a risk in the procedure, and it happens, doesn't mean that the defendant is not liable in the event of [a] breach in the standard of care." (Internal quotation marks omitted.) *Id.*

¶ 104        The Supreme Court of Connecticut concluded that the trial court erred. *Id.* at 889. The court first noted that it had not "previously had the opportunity to consider whether evidence of the risks of a medical procedure, as communicated to a patient by a physician, is unduly prejudicial or confusing under [Connecticut law] in a medical malpractice action that does not include a claim of lack of informed consent," and the court then looked to *Waller* and *Wright. Id.* at 888. After discussing those two cases, the court concluded that the trial court "abused its discretion when it admitted evidence of the risks of the microdiscectomy in the form of their disclosure to the plaintiff." *Id.* at 889. The court explained as follows:

> "The admission of evidence that [the defendant] had told the plaintiff of those risks, namely, his testimony and the office notes to that effect, implicates the concerns

about jury confusion raised by our sister state courts that have considered the issue of the admissibility of informed consent evidence in medical malpractice cases without informed consent claims. [Citation.] Put differently, admission of testimony about what the plaintiff specifically had been told raised the potential that the jury might inappropriately consider a side issue that is not part of the case, namely, the adequacy of the consent. Indeed, this potential was further increased in this case because of the rebuttal testimony of [the plaintiff], which disputed what [the defendant] had told the plaintiff. *** Thus, although evidence of the risks of a surgical procedure is relevant in the determination of whether the standard of care was breached, it was unduly prejudicial to admit such evidence in the context of whether and how they were communicated to the plaintiff. Rather, such evidence is properly admitted, without this risk of confusion and inappropriate prejudice, in the form of, for example, testimony by the defendants or nonparty expert witnesses about the risks of the relevant surgical procedures generally." *Id.* at 889-90.

¶ 105    Nonetheless, although the evidence was admitted in error, the Connecticut Supreme Court concluded that the error was harmless. *Id.* at 891. Under Connecticut law, "an evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful." (Internal quotation marks omitted.) *Id.* at 890. "[A]n improper ruling [is] harmful [when] the...ruling [likely] would [have] affect[ed] the result" and is considered harmless only if the reviewing court has a "fair assurance that [the error] did not affect the jury's verdict." (Internal quotation marks omitted.) *Id.* at 890. The court noted that "[a] determination of harm" required it "to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial." (Internal quotation marks omitted.) *Id.* The court concluded, "Having reviewed the entire record in this case,

we conclude that there is a fair assurance that this evidentiary impropriety was harmless and did not likely affect the jury's verdict." *Id.* at 891.

¶ 106        We conclude that the reasoning and analysis set forth in *Waller*, *Wright*, and *Hayes* are sound and persuasive. Moreover, the reasoning and analysis of these cases is consistent with basic principles of Illinois law set forth in the Illinois Rules of Evidence.

¶ 107          b. Illinois Rules of Evidence and Their Application to This Case

¶ 108        Illinois Rule of Evidence 401 (eff. Jan. 1, 2011) defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Under Illinois Rule of Evidence 403 (eff. Jan 1, 2011), however, relevant evidence may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

¶ 109        Applying these principles, we conclude that, although evidence that scarring, swelling, and nerve damage were known risks or complications of the surgical procedures was indeed relevant under Rule 401 because such evidence makes it more probable that Wakenight's injuries were not a result of negligence by Dr. Gumbiner, evidence that Dr. Gumbiner *advised* Wakenight of the known risks and complications was not relevant regarding any issue in this case.

¶ 110        We emphasize again that Wakenight does not challenge the admission of evidence of known risks and complications of the procedures; instead, she challenges the admission of evidence of Dr. Gumbiner's *advising her* of the known risks and complications.

¶ 111        Although this distinction is a fine one, it nonetheless is important and significant. That is because, in a medical negligence claim against Dr. Gumbiner, that he *told* Wakenight that swelling, scarring, and nerve damage were known risks and complications does not matter.

¶ 112 The fact that she was *told* these were known risks does not make it more or less probable that her injuries were (1) a natural result of the surgical procedures in the absence of negligence or (2) a result of a breach of the standard of care by Dr. Gumbiner. Put another way, the fact that a physician told a patient that scarring, swelling, or nerve damage could occur *has no bearing* on the issues of causation or breach of the standard of care and is therefore irrelevant.

¶ 113 Dr. Gumbiner, and other medical experts called by the defense, could have testified simply that scarring, swelling, and nerve damage are known risks of the procedures Dr. Gumbiner performed on Wakenight. And when so testifying, neither Dr. Gumbiner nor any other medical expert needed—or should have been permitted—to testify about whether Dr. Gumbiner informed Wakenight of those risks.

¶ 114 Indeed, Wakenight's counsel conceded as much when he argued at the hearing on the motion for a new trial, "I think we both agree that this testimony can come in if it comes in properly. It came in improperly. Their expert should have been the one talking about this."

¶ 115 Defendants argue that Dr. Gumbiner's advising Wakenight of the known risks and complications preoperatively is relevant to his credibility because it shows that he did not make them up after he discovered Wakenight's injuries in order to cover up his negligence. That claim is not at all persuasive.

¶ 116 To begin, we note that although Wakenight did not provide a complete record of the report of proceedings from the jury trial, nothing in the record before us suggests that Wakenight accused Gumbiner before, during, or after trial of attempting to cover up his negligence. Had that been the case, perhaps our analysis might be different. But more importantly, introducing evidence of known risks and complications the proper way—that is, through an expert medical witness—would achieve the same result of deflecting any suggestion that Dr. Gumbiner

fabricated the known risks and complications after the fact to cover his errors.

¶ 117        Moreover, even if we agreed, for argument's sake, that evidence of Dr. Gumbiner's advising Wakenight of the known risks and complications bore some relevance to his credibility in this case, defendants would still have a Rule 403 problem. The probative value of that testimony, as it supposedly pertained to his credibility, would be substantially outweighed by the danger of confusion of the issues for the same reasons explained by our sister state courts in *Waller*, *Wright*, and *Hayes*.

¶ 118        Having considered the evidence that Dr. Gumbiner discussed with Wakenight, prior to surgery, the known risks and complications of that surgery, as it was introduced by defendants in this case, we conclude (1) this evidence was irrelevant under Rule 401 and (2) whatever minimal probative value it may have had—and we conclude it had none—was substantially outweighed by the danger under Rule 403 of confusing the jury.

¶ 119        However, we must still address whether the erroneous admission of the evidence substantially prejudiced Wakenight, such that she merits a new trial.

¶ 120                    2. *Whether Wakenight Was Substantially Prejudiced*

¶ 121        As we previously stated, to receive a new trial, Wakenight bears the burden of demonstrating that the erroneous admission of evidence substantially prejudiced her and affected the outcome of the trial. *Rossi*, 2023 IL App (4th) 220643, ¶ 160. Upon review, "[w]here it appears that an error did not affect the outcome of the trial, or where the reviewing court can see from the entire record that the error did not result in substantial prejudice, the judgment will not be disturbed." *Bachman*, 332 Ill. App. 3d at 785.

¶ 122                    a. The Admission of Risk and Complication Evidence

¶ 123        Wakenight contends that the admission of the improper evidence we earlier

discussed substantially prejudiced her by "improperly conflating informed consent principles of law *** with medical negligence," effectively misleading the jury. Wakenight contends that the "prejudicial nature and frequency of [the improper] risk testimony is clear in the record," identifying several instances during the trial that the trial court allowed improper evidence of known risks and complications: (1) during opening statements, when defense counsel stated that "Dr. Gumbiner had a 'lengthy discussion' with [Wakenight] about the potential risks and benefits of the surgical procedures, 'including the risk of nerve damage,' *before* she elected to proceed"; (2) during cross-examination of Wakenight, when defense counsel "repeatedly asked whether Dr. Gumbiner informed her of specific risks including *** scar formation, *** swelling, and nerve damage, and [Wakenight] was forced, over objection, to confirm she had been so informed"; (3) during direct examination of Dr. Gumbiner, when he "testified at length *** that he discussed risks including *** scar tissue, nerve damage, [and] changes in foot biomechanics"; and (4) again during direct examination of Dr. Gumbiner, when he " highlighted risks of nerve entrapment and scarring *before* the second surgery." (Emphases in original.) (We note that Wakenight's brief identifies this last occurrence as happening during Dr. Gumbiner's redirect examination, but it actually occurred during his direct examination.)

¶ 124 Unfortunately for Wakenight, we are unable to determine whether these instances caused her substantial prejudice—meaning she has not met her burden of demonstrating substantial prejudice—because she has not provided a complete record of the trial. The Illinois Supreme Court has made clear that

> "an appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in

conformity with law and had a sufficient factual basis." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

Moreover, "[a]ny doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Id.* at 392.

¶ 125    In *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 558-59 (1976), the Illinois Supreme Court emphasized the importance of reviewing the record as a whole when determining whether to grant a new trial based upon evidentiary errors, writing as follows:

"The record discloses minor improprieties by both sides during the course of the trial. This was a lengthy, complex and difficult trial, and both sides were represented by experienced and forceful attorneys. In ruling on plaintiffs' post-trial motions, the trial court stated that 'although there probably existed error in the conduct of the counsel and the rulings in the conduct of the entire trial, *** the court feels that taking the trial as a whole, it was a fair trial, and for the court to grant any of the relief requested by plaintiffs *** would be an erroneous intrusion on the jury's deliberated verdict.' We agree with the trial court's assessment of the trial and with its conclusions.

Plaintiff is not entitled to an absolutely error-free trial. [Citation.] 'Where it appears that an error did not affect the outcome below, or where the court can see *from the entire record* that no injury has been done, the judgment or decree will not be disturbed.' (*Both v. Nelson* (1964), 31 Ill. 2d 511, 514.) The trial taken as a whole was fair, and none of plaintiffs' allegations of error merit reversal of the jury's verdict." (Emphasis added.)

¶ 126    Similarly, in *Simmons v. Garces*, 198 Ill. 2d 541, 566 (2002), the supreme court

wrote, "*After a careful review of the record*, we conclude that none of these alleged [evidentiary] errors or instances of alleged misconduct prevented plaintiffs from receiving a fair trial. Any error that might have occurred did not affect the outcome ***." (Emphasis added.)

¶ 127    In the present case, we are unable to conduct a careful review of the entire record to determine whether Wakenight has demonstrated she was substantially prejudiced by the error or that the error affected the outcome of the trial because we do not have the entire record.

¶ 128    Being able to review the entire record is particularly important in this case because, as we have discussed, the admission of evidence regarding known risks and complications through medical experts would be proper. And, indeed, in this case, two medical experts—Dr. Braver and Dr. Barrett—testified about known risks and complications.

¶ 129    For example, Dr. Braver, Wakenight's expert, testified that "neuropraxia," or nerve injury, could be caused "by a lot of different things," including compression. He also testified that postsurgical swelling could occur if a patient fails to elevate the leg sufficiently or increases his or her activity. He also agreed with the general assertion that a cast could be applied consistent with the standard of care and swelling could occur that would require the cast to be removed or bivalved. Last, he testified that postoperative swelling and scar tissue "always happen with any surgery you do."

¶ 130    And Dr. Barrett, defendants' expert, testified that Wakenight's injuries were caused by "robust exuberant scar tissue formation" around Wakenight's sural nerve resulting from the first surgery and not any failure by Dr. Gumbiner to protect the nerve. He also believed that Dr. Gumbiner applied the cast properly, but postapplication swelling caused it to tighten.

¶ 131    Two other physicians testified at trial—Dr. Santangelo (via video deposition) and Dr. Meshulam—but Wakenight did not provide their testimony as part of the record. We view this

omission as important because the trial court, in its written order denying Wakenight's posttrial motion, wrote the following: "The admission of the disclosure of known complications from *** Dr. Gumbiner to [Wakenight] was relevant in informing the jury that even if the standard of care is met, this was a possible outcome for [Wakenight]. *The evidence was reliable because all physicians that testified confirmed the same.*" (Emphasis added.) The court also wrote in that order, "[I]t was undisputed by the experts that [Wakenight's] outcome could have occurred if the standard of care was adhered to because it was a known potential complication of the surgery."

¶ 132　　　　The trial court's written order seems to indicate that Dr. Santangelo and Dr. Meshulam also testified about whether Wakenight's injuries could occur absent negligent conduct. Because their testimony was not included as part of the record on appeal, we simply do not know what, if anything, they said regarding this issue. As a consequence, we are unable to weigh the effect of Dr. Gumbiner's and Wakenight's improper testimony against the proper testimony of Dr. Braver and Dr. Barrett, and possibly Dr. Santangelo and Dr. Meshulam. And, as we have noted, "Any doubts which may arise from the incompleteness of the record will be resolved against the appellant." *Foutch*, 99 Ill. 2d at 392. Accordingly, we must presume that the trial court's written order was supported by the evidence. See *Walsh v. Sklar*, 2025 IL App (1st) 231830, ¶ 104; *Midwest Builder Distributing, Inc. v. Lord & Essex, Inc.*, 383 Ill. App. 3d 645, 655 (2007).

¶ 133　　　　Moreover, it is not only the absence of Dr. Santangelo's and Dr. Meshulam's testimony that hinders our assessment of whether Wakenight received a fair trial. We are additionally missing (1) the pretrial hearing on the motions *in limine*, (2) Wakenight's opening statement, (3) Wakenight's direct examination, (4) the testimony of Wakenight's witnesses Irgin and Braley, (5) Dr. Gumbiner's complete direct examination, (6) Wakenight's closing argument, (7) any objections, argument, or discussion relating to the admission of risk and complication

evidence that occurred during the trial outside the presence of the jury, (8) discussion of the special interrogatories, and (9) the jury instruction conference.

¶ 134 As we earlier noted, determining whether Wakenight has been substantially prejudiced by an evidentiary error requires a review of the whole trial. Because Wakenight has provided only portions of the trial court records, we are unable to perform that review. As a result, Wakenight has failed to meet her burden of showing that she was substantially prejudiced by the admission of the evidence of which she complains on appeal.

¶ 135 b. The Unpled Affirmative Defense

¶ 136 Wakenight also argues that she was substantially prejudiced because the admission of the erroneous evidence allowed defendants to assert an unpled affirmative defense that Wakenight, by being informed of the risks and complications of the surgeries and electing to proceed anyway, assumed the risk of the surgeries and waived her right to sue for negligence.

¶ 137 As an initial matter, we note that following the hearing on plaintiff's motion *in limine*, the trial court ordered, and defendants agreed, that defendants could not introduce Wakenight's informed consent form or argue that Wakenight waived any claim of negligence. Our review of the excerpts of the trial testimony that Wakenight provided shows that defendants made no explicit references during questioning to informed consent, assumption of the risk, or waiver of the right to sue. Similarly, defendants did not argue to the jury during closing argument that Wakenight gave her informed consent to the procedures, assumed the risk, or waived her right to sue. Indeed, in her brief to this court, Wakenight does not point to any explicit references by defendants to informed consent, assumption of the risk, or waiver of the right to sue.

¶ 138 Wakenight argues, instead, that this affirmative defense was *implied* by the defendants. She points to the same instances we have already discussed (*supra* ¶¶ 22, 40, 51-52,

64), during which defendants elicited testimony from Wakenight and Dr. Gumbiner that he discussed the known risks and complications with her, as well as defense counsel's comments during opening statements regarding the same.

¶ 139      However, Wakenight's argument fails.

"A party does not establish the necessity of reversal for an alleged error concerning the admission of evidence unless that party can overcome the burden of showing that the error materially affected the outcome of the trial. [Citation.] *** [W]e may not presume that an appellant suffered some hardship from an allegedly erroneous admission of evidence, but must instead be convinced that the jury did, in fact, reach the prejudicial conclusion." *Cerveny v. American Family Insurance Co.*, 255 Ill. App. 3d 399, 413-14 (1993).

¶ 140      Not only does Wakenight contend that defendants were allowed to assert an *implied* affirmative defense, she asks us to *infer* that the jury's verdict was affected by that implied defense. Because Wakenight points to nothing in the record that convinces us that (1) defendants were allowed to assert an unpled affirmative defense, shifting the burden to Wakenight to disprove, or (2) the jury's verdict was affected by such an affirmative defense, we conclude that Wakenight has failed to meet her burden of demonstrating that she was substantially prejudiced and did not receive a fair trial.

¶ 141                  III. CONCLUSION

¶ 142      For the reasons stated, we affirm the judgment of the trial court.

¶ 143      Affirmed.

*Wakenight v. Katherine Shaw Bethea Hospital*, 2026 IL App (4th) 251048

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lee County, No. 20-L-26; the Hon. Matthew T. Klahn, Judge, presiding. |
| **Attorneys for Appellant:** | C. Nicholas Cronauer, of Cronauer Law, LLP, of Sycamore, for appellant. |
| **Attorneys for Appellee:** | Mark C. Meyer and Melissa Lynott Mitchell, of Cunningham, Meyer & Vedrine, P.C., of Warrenville, for appellees. |